# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | |
|---|---|
| KEVIN MCCANN, on behalf of himself and all others similarly situated, ) ) ) | Case No.: |
| Plaintiff, ) ) | |
| vs. ) ) | **CLASS ACTION COMPLAINT** |
| VOLKSWAGEN GROUP OF AMERICA, INC., and DOES 1 through 10, inclusive, ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants. ) ) ) | |

Plaintiff Kevin McCann, individually and on behalf of all others similarly situated (the "Classes") alleges as follows:

## I.      INTRODUCTION

1.      On September 18, 2015, following a lengthy investigation, the United States Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") issued notices of violation ("NOV") against Volkswagen Group of America, Inc., ("Volkswagen") finding that almost 500,000 vehicles equipped with the 2.0 liter TDI® Claim Diesel engine manufactured both by Audi and Volkswagen failed to meet federal and California state emissions requirements.  Volkswagen markets, advertises, distributes and sells vehicles under the Audi and Volkswagen brand names throughout the United States.  As a consequence of the investigation carried out by the EPA and CARB, Volkswagen admitted that these diesel cars have been certified for sale under both federal and California state emissions requirements only because they had been equipped with emissions control devices that "circumvent[] EPA emissions standards for certain air pollutants also referred to as a "defeat device."  This "defeat device" had been included in several Audi and Volkswagen models sold in the 2009 through 2015 model years and equipped with the "2.0 liter TDI® Clean Diesel" engine:

- o Volkswagen Jetta, Jetta SportWagen (2009-2015)
- o Volkswagen Beetle, Beetle Convertible (2009-2015)
- o Audi A3 (2009-2015)
- o Volkswagen Golf (2009-2015)
- o Volkswagen Passat (2014-2015)
- o Volkswagen Golf SportWagen (2015)

(Hereinafter collectively referred to as the 2.0 liter TDI® Clean Diesel engine vehicles" or "Clean Diesel Vehicles"). Within days, Volkswagen was forced to acknowledge that the defeat devices had been installed on as many as 11 million 2.0 liter TDI Clean Diesel engines sold throughout the world.

2.     A September 18, 2015 press release by the CARB described these defeat devices:

[A] sophisticated software algorithm on certain Volkswagen vehicles [that] detects when the car is undergoing official emissions testing, and turns full emissions controls on only during the test. The effectiveness of these vehicles' pollution emissions control devices is greatly reduced during all normal driving situations. This results in cars that meet emissions standards in the laboratory or testing situation, but during normal operation, emit nitrogen oxides or (NOx), at up to 40 times the standard.

For years, Volkswagen marketed the 2.0 liter TDI® Clean Diesel cars as an alternative to traditional gas vehicles as well as electric and hybrid vehicles. Volkswagen did so by highlighting the fact that these "clean diesel" cars had much better mileage than traditional gas vehicles while having much better performance than hybrid or electric vehicles.

3.     NOx emissions are tightly regulated in the United States because they have a variety of negative environmental impacts. Most significantly, by reacting with volatile organic compounds such as methane, NOx forms tropospheric ozone, which, in turn, can damage lung tissue in children, the elderly and asthmatics. In addition, once in the atmosphere NOx gases react forming smog and acid rain.

4.     Based on representations made by Volkswagen, hundreds of thousands of consumers throughout the United States purchased vehicles that emit unsafe and illegal amounts of dangerous gaseous chemicals. These dangerous vehicles will be subject to a recall so that the

onboard computers that monitor and control vehicle emissions can be replaced or updated to put the vehicles in compliance with federal and California state emissions requirements. Assuming that it is possible to make these vehicles compliant with emissions requirements, the changes made pursuant to a recall will negatively impact the performance and/or fuel economy of the vehicles, if not both. If it is not possible to modify these vehicles to bring them into compliance with emissions requirements, it is unclear whether it will be legal to operate them. In either instance, the residual value of these vehicles has been substantially and negatively impacted.

## II.     JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregate claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs. More than two-thirds of the proposed plaintiff class are citizens of states other than the Defendant's. This Court also has jurisdiction to decide claims brought under 15 U.S.C. § 2301 (the Magnuson- Moss Warranty Act) by virtue of 28 U.S.C. § 1332(a)-(d) and 28 U.S.C. § 1331.

6.      This Court has jurisdiction over Volkswagen because Volkswagen conducts business in Chattanooga, Tennessee and the district and has minimum contacts in the district or otherwise intentionally avails itself of the markets within the district through its promotion, sale, marketing, and distribution of its vehicles sufficient to render the exercise of jurisdiction by this Court proper and necessary. Defendant also maintains a vehicle production facility in Chattanooga, Tennessee and manufactures Clean Diesel Vehicles in such facility.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

### III.    PARTIES

8.      Plaintiff Kevin McCann ("Plaintiff") is an individual residing in Bow, New Hampshire, who purchased a 2011 Volkswagen Jetta Sportswagen TDI equipped with a 2.0 liter diesel engine for approximately $24,000 in Manchester, New Hampshire.  Plaintiff still owns this vehicle.  At the time Plaintiff purchased this vehicle, he was unaware that the vehicle was equipped with a defeat device that evaded applicable emissions requirements.  Plaintiff purchased this vehicle based on representations made by Volkswagen regarding its performance, gas mileage, compliance with applicable regulations and fitness for use as a personal vehicle.  As a result of Volkswagen's actions and its false statements, Plaintiff has suffered an ascertainable loss caused by, *inter alia*, out-of-pocket- losses, future additional fuel costs, diminished performance of the vehicle and diminished residual and/or resale value of the vehicle.

9.      Defendant Volkswagen Group of America, Inc. ("Volkswagen") is a New Jersey corporation headquartered at 2200 Ferdinand Porsche Drive, Herndon, Virginia.  Volkswagen manufactures, distributes, markets and sells vehicles under both the Audi and Volkswagen brand names throughout the United States and its territories.

### IV.    FACTS

####    A.    Concerns over Pollution and Adverse Health Impacts Result in Strict Federal and State Regulation

10.     The EPA NOV, attached hereto as "Exhibit A," provides a detailed summary of the history, purpose and application of federal regulation of vehicle emissions pursuant to the Clean Air Act and the EPA's treatment of defeat devices.

> In creating the CAA, Congress found, in part, that "the increasing use of motor vehicles ... has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 740 1(a)(2). Congress' purpose in creating the CAA, in part, was "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." CAA § 101(b)(1)-

(2), 42 U.S.C. § 7401 (b)(l)-(2). The CAA and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of nitrogen oxides (NOx) and other pollutants from mobile sources of air pollution. Nitrogen oxides are a family of highly reactive gases that play a major role in the atmospheric reactions with volatile organic compounds (VOCs) that produce ozone (smog) on hot summer days. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. Breathing ozone can also worsen bronchitis, emphysema, and asthma. Children are at greatest risk of experiencing negative health impacts from exposure to ozone.

\* \* \*

Light-duty vehicles must satisfy emission standards for certain air pollutants, including NOx. 40 C.F.R. § 86.1811-04. The EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emission standards. Under this program, the EPA issues certificates of conformity (COCs), and thereby approves the introduction of vehicles into United States commerce.

To obtain a COC, a light-duty vehicle manufacturer must submit a COC application to the EPA for each test group of vehicles that it intends to enter into United States commerce. 40 C.F.R. § 86.1843-0 I. The COC application must include, among other things, a list of all auxiliary emission control devices (AECDs) installed on the vehicles. 40 C.F.R. § 86.1844-01(d)(ll). An AECD is "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. The COC application must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01 (d)(11).

\* \* \*

The CAA makes it a violation "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." CAA § 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii). Additionally, manufacturers are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new motor vehicle unless that vehicle is covered by an EPA-issued COC. CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); 40

C.F.R. § 86.1854-12(a)(I). It is also a violation to cause any of the foregoing acts.
CAA § 203(a), 42 U.S.C. § 7522(a); 40 C.F.R. § 86-1854-12(a).

11.     In addition to the Federal Clean Air Act, the State of California maintained its own air quality standards, implemented through regulations that applied to all cars marketed and sold within the state.  As part of efforts to curb greenhouse gases, reduce pollution and address the negative health impacts caused by pollution, CARB has adopted a series of standards for vehicle emissions, including standards for diesel engines used in passenger cars.  In 2002, CARB adopted regulations implementing "Strategies to Control Emissions from Diesel Engines."  Pursuant to these regulations, diesel engines certified for road use must employ emissions controls that substantially reduce NOx emissions.  13 CCR § 2700 *et seq*.

12.     CARB regulation of diesel emissions is rooted lengthy research into the negative impact of diesel exhaust on the health of Californians and environmental quality.

> Diesel engines emit a complex mixture of air pollutants, composed of gaseous and solid material. The visible emissions in diesel exhaust are known as particulate matter or PM. ***In 1998, California identified diesel exhaust particulate matter (PM) as a toxic air contaminant based on its potential to cause cancer, premature death, and other health problems***. Diesel engines also contribute to California's fine particulate matter (PM2.5) air quality problems. Those most vulnerable are children whose lungs are still developing and the elderly who may have other serious health problems. ***Based on year 2006-2008 emissions in California, diesel PM contributes each year to approximately 2,000 premature deaths, with an uncertainty range of 1,500 to 2,400. In addition, diesel soot causes visibility reduction and is a potent global warmer***.[1]
>
> http://www.arb.ca.gov/research/diesel/diesel-health.htm.

### B.     The EPA and CARB Discover Volkswagen's Deceptive Conduct

13.     On Friday, September 18, 2015, the EPA and CARB each issued notices of violation to Volkswagen.  Both NOVs contained a shocking determination – that Volkswagen had, for years, included a defeat device in its 2.0 liter TDI® Clean Diesel engines.  This defeat device was designed specifically to mask the inability of the 2.0 liter TDI® Clean Diesel engine,

---

[1] Emphasis added throughout except where otherwise noted.

as designed, to comply with applicable federal and state emissions standards and requirements. As a result of this defeat device, nearly 500,000 Volkswagen and Audi vehicles were certified as being compliant with applicable regulations when, in fact, in some cases the engines emitted forty times the allowable levels of certain pollutants.

14.     In its very first paragraph, the EPA NOV concluded that "*[t]hese defeat devices bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with [Clean Air Act] emission standards*.  Therefore, VW violated section 203(a)(3)(B) of the [Clean Air Act], 42 U.S.C. § 7522(a)(3)(B)."

15.     The CARB NOV, attached hereto as "Exhibit B," which noted Volkswagen's "admission of [use of a] defeat device" stated that "[i]n order to protect public health and the environment from harmful pollutants, the California Air Resources Board (CARB) rigorously implements its vehicle regulations through its certification, in use compliance, and enforcement programs."  The CARB NOV then went on to summarize the lengthy investigative efforts undertaken by the agency.

> CARB was engaged in dialogue with our European counterparts concerning high in-use emissions from light duty diesels.  CARB deployed a number of efforts using portable measurement systems and other approaches to increase our understanding of the California fleet.  In 2014, the International Council for Clean Transportation (ICCT) and West Virginia University (WVU) identified through their test program, and brought to the CARB's and the United States Environmental Protection Agency's (EPA) attention, concerns of elevated oxides of nitrogen (NOx) emissions over real world driving.  The ICCT actions were consistent and complementary to our activities.  This prompted CARB to start an investigation and discussions with the Volkswagen Group of American (VW) on the reasons behind these high NOx emissions observed on their 2.0 liter diesel vehicles over real world driving conditions.  *As you know, these discussions over several months culminated in VW's admission in early September 2015 that it has, since model year 2009, employed a defeat device to circumvent CARB and the EPA emission test procedures.*
>
> VW initiated testing to replicate the ICCTIWVU testing and identify the technical reasons for the high on-road emissions. VW shared the results of this testing and a proposed recalibration fix for the Gen1 (Lean NOx Trap technology) and Gen2 (Selective Catalytic Reduction (SCR) technology) with CARB staff on December

2, 2014. Based on this meeting, CARB and EPA at that time agreed that VW could implement the software recall; however, CARB cautioned VW that if our confirmatory testing showed that the fix did not address the on-road NOx issues, they would have to conduct another recall. Based on this meeting, VW initiated a voluntary recall in December 2014 which, according to VW, affected approximately 500,000 vehicles in the United States (-50,000 in California). The recall affected all 2009 to 2014 model-year diesel fueled vehicles equipped with Gen1 and Gen2 technology. This recall was claimed to have fixed among other things, the increased real world driving NOx issue.

CARB commenced confirmatory testing on May 6, 2015 to determine the efficacy of the recall on both the Gen1 and Gen2 vehicles. CARB confirmatory testing was completed on a 2012 model-year Gen2 VW test group CVWX02.0U4S, to be followed with Gen1 testing. CARB staff tested this vehicle on required certification cycles (FTP, US06 and HWFET) and over-the-road using a Portable Emission Measurement Systems (PEMS). On some certification cycles, the recall calibration resulted in the vehicle failing the NOx standard. Over-the-road PEMS testing showed that the recall calibration did reduce the emissions to some degree but NOx emissions were still significantly higher than expected.

To have a more controlled evaluation of the high NOx observed over the road, CARB developed a special dynamometer cycle which consisted of driving the Phase 2 portion of the FTP repeatedly. This special cycle revealed that VW's recall calibration did increase Diesel Exhaust Fluid (DEF) dosing upon initial startup; however, dosing was not sufficient to keep NOx emission levels from rising throughout the cycle. This resulted in uncontrolled NOx emissions despite the SCR reaching sufficient operating temperatures.

***CARB shared its test results with VW on July 8, 2015. CARB also shared its results with the EPA. Several technical meetings with VW followed where VW disclosed that Gen1, Gen2 and the 2015 model-year improved SCR vehicle (known as the Gen3) had a second calibration intended to run only during certification testing.*** During a meeting on September 3, 2015, VW admitted to CARB and EPA staff that these vehicles were designed and manufactured with a defeat device to bypass, defeat, or render inoperative elements of the vehicles' emission control system. ***This defeat device was neither described nor justified in the certification applications submitted to EPA and CARB. Therefore, each vehicle so equipped would not be covered by a valid federal Certificate of Conformity (COC) or CARB Executive Order (EO) and would be in violation of federal and state law.***

Based upon our testing and discussions with VW, CARB has determined that the previous recall did not address the high on-road NOx emissions, and also resulted in the vehicle failing certification standards. Therefore, the recall is deemed ineffective and is deemed unapproved. ***VW must immediately initiate discussions with CARB to determine the appropriate corrective action to rectify the emission non-compliance and return these vehicles to the claimed certified configuration.*** CARB program and enforcement staff is prepared to work closely with VW to find corrective actions to bring these vehicles into compliance.

CARB has also initiated an enforcement investigation of VW regarding all model-year 2009 through 2015 light-duty diesel vehicles equipped with 2.0 liter engines. We expect VW's full cooperation in this investigation so this issue can be addressed expeditiously and appropriately.

16.     The EPA and CARB NOVs disclosed the lengthy efforts undertaken by both agencies leading up to Volkswagen's belated admission that, for years, it had gamed emissions standards in order to allow it to put cars on the road that spew dangerous and illegal pollutants. Both the EPA and CARB NOVs indicated that their investigations of Volkswagen were continuing and that the matter might be referred for further criminal investigation and prosecution. Moreover, based on the Volkswagen's admission that the subject vehicles contained defeat devices, the potential fines faced by Volkswagen in the United States alone could be in excess of $18 billion. Separate and apart the potential fines and potential criminal action, both the EPA and CARB NOVs demanded that Volkswagen take immediate steps to address cars sold with its illegal defeat device and remedy their inherent and purposeful defects.

**C.     Volkswagen's Marketing Highlights the Performance, Efficiency and Environmental Benefits of its "Clean Diesel" Engine**

17.     Volkswagen has consistently marketed the 2.0 liter TDI® Clean Diesel equipped cars as fuel-efficient and environmentally friendly while still being performance oriented. The 2.0 liter TDI® Clean Diesel, first introduced in 2009, was heralded as a significant technological improvement over older diesel engines. With its turbocharged direct injection ("TDI"), the 2.0 liter TDI® Clean Diesel was marketed as providing the same fuel economy that diesel engines had long been known for coupled with substantially enhanced performance, a no compromise mix of performance, fuel economy and clean emissions. The "technical innovation" of the 2.0 liter TDI® Clean Diesel engine was also touted by Volkswagen in marketing materials for its Audi line of cars. For example, the brochure for the 2015 Audi A3 provided a graphic

explaining why the 2.0 liter TDI® Clean Diesel was "one of the most advanced diesel engines in the world."



18.    The 2012 Golf TDI Clean Diesel was marketed as clean and performance oriented:

You may not know that the T in TDI stands for turbo, but you'll see why when you get behind the wheel.  It's the perfect union of power, performance, and fuel efficiency that delivers 140 hp and 236 lbs/ft torque for exceptional acceleration off the line, all while getting up to 42 mpg.  That's up to 609 miles on one tank. Plus, the TDI Clean Diesel engine produces 90 percent fewer sooty emissions than previous diesel engines.  That's what we like to call a win-win-win situation.



19.     While claiming to deliver on power and performance, Volkswagen also promised a car that was good for the environment.  The 2013 Golf TDI Clean Diesel was sold as "Good, clean fun" with "236 lb/ft of torque for some serious oomph."  "But what's more amazing is what is doesn't give you: those sooty emissions from years past.  In fact, it has 90% fewer emissions than previous diesel engines."  Volkswagen distinguished the TDI logo with a stripe of blue, explaining that "[t]he color blue symbolizes our commitment to building environmentally conscious cars that don't compromise performance.  And setting a good example for eco-conscious behavior, everywhere, and every day."



This same Volkswagen marketing brochure claimed that in vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, "you get a lot more of everything, without giving up anything," promising "up to 814 highway miles on a single tank of fuel" and "all that addictive torque."



20.     Brochures for the 2015 Volkswagen Jetta referred to the "efficient 2.0L TDI Clean Diesel engine" and highlighted claims of 46 MPG freeway gas mileage coupled with 236 pound feet of torque as indicia that the car was both "efficient" and "performance" oriented. Similarly, marketing material for the 2015 Volkswagen Bug highlighted the 2.0L TDI Clean

Diesel engine, stated that "[s]aving has never been so fun.  This available turbocharged diesel engine gets impressive mileage, along with putting out an equally impressive 236 lbs/ft of torque."

21.     The 2015 Volkswagen Passat equipped with the 2.0L TDI® Clean Diesel was marketed both for its performance and fuel economy: "[w]ith up to 43 hwy mpg, it's easy to see why the TDI Clean Diesel gives the Passat more range than any other midsize sedan in its class. And since it's turbocharged, we didn't have to sacrifice an ounce of power to be incredibly efficient."

22.     Volkswagen marketed the 2.0 liter TDI® Clean Diesel as a no-compromises engine, "Fast.  Efficient.  Stylish.  Pick three."



**Fast. Efficient. Stylish. Pick three.**

With a TDI Clean Diesel engine, you get a lot more of everything, without giving up anything. The direct-injection engine of the Passat TDI was engineered to go the distance—up to 814 highway miles on a single tank of fuel.* Add in all that addictive torque and this will lead to road trip after road trip.

Volkswagen has sold more diesel cars in the U.S. than every other brand combined**
Turbocharged performance and efficiency†

23.     The combination of performance, fuel efficiency and "clean" emissions was constantly highlighted by VW.  For example the website for Volkswagen Group of America highlighted its technology under "Environment," "TDI: Clean Diesel for Everyone"

> Audi and Volkswagen pioneered TDI® clean diesel engines and today, the Volkswagen Group of America is **the market leader in clean diesel**. In 2013, Audi and Volkswagen sold more than 100,000 clean diesel cars in the United States. **Clean diesel delivers more torque, lower fuel consumption and reduces CO2 emissions compared with equivalent gasoline engines**. Volkswagen's newest and most fuel-efficient TDI Clean Diesel engine will power the 2015 Golf, Beetle, Passat and Jetta starting in the second half of 2014.
>
> Audi has been at the forefront of clean diesel since the introduction of Audi TDI technology in 2009. Since then, nearly 40,000 Audi TDI vehicles have been sold in the United States, delivering an average of 30 percent better fuel economy and range than gasoline. Continuing our commitment to clean diesel technology and innovative solutions that improve efficiency and driving dynamics, Audi has made a dramatic expansion of TDI technology in the United States for the 2014 model year. Available TDI models include the A6, A7, A8 L, Q5 and Q7, as well as the introduction of the A3 TDI sedan.
>
> http://www.volkswagengroupamerica.com/clean_diesel_tdi.html.

24.     Volkswagen also made specific representations about "Making diesel cleaner," claiming that the 2.0 liter TDI® Clean Diesel" developed by Audi "achieved ultra-low emissions vehicle (Bin-5/ULEV II) status in all 50 states while reducing emissions by an average of 12% compared to their gasoline equivalents." Volkswagen asserted that "[w]ith innovative diesel particulate filters and the nontoxic AdBlue® reducing agent, we eliminate 95% of diesel NOx emissions."  According to Volkswagen this, coupled with the increased fuel efficiency of diesel resulted in an engine that gets "30% more mpg than comparable gasoline engines."

25.     Prior to the publication of the EPA and CARB NOVs, Volkswagen had won wide praise for its implementation of the 2.0 liter TDI® Clean Diesel engine.  The 2011 Golf was named by the Kelley Blue Book ("KBB"), one of the most widely relied on used car pricing guides, as one of the "Top 10 Green Cars" of 2011.  KBB noted that the 2.0 liter TDI® Clean Diesel was "capable of delivering quick launches and 42 highway miles per gallon."  In addition,

the Volkswagen Golf was named the 2015 Car of the Year by Motor Trend magazine. In naming the Golf, Motor Trend highlighted the performance and fuel economy of the 2.0 liter TDI® Clean Diesel engine.

> Even more impressive, Volkswagen has also included room in the line-up for diesel . . . versions of the Golf. The Golf TDI and its 2.0-liter turbo-diesel inline-four return an EPA combined rating of 36mpg . . . . The best part is that neither car is a penalty box to drive. What the TDI lacks in horsepower it mostly makes up for in torque. While it didn't feel quite as quick as the TSI, it was no slouch for a C-segment car.

Motor Trend further noted that "[n]o matter which Golf variant we jumped into, we emerged with smiles on our faces . . . . [w]e were also impressed with the powertrains in our Golf variants – from the TDI's torquey low-end surge to the GTI's rev-happy rush, there wasn't a dud in the group."

26.     Volkswagen's false claims regarding its diesel engines continued through at least two versions of the 2.0 liter TDI® Clean Diesel engine. For example, in 2014, as Volkswagen marketed a revised diesel engine slated for inclusion in 2015 models, Douglas Skorupski, Volkswagen's manager of technical strategy, described the 2015 revision to the 2.0 liter TDI® Clean Diesel, dubbed the "EA288" engine, as "continuing to improve and will be even cleaner and more fuel-efficient and powerful." An article published by JD Power and Associates on March 19, 2014, noted that "Volkswagen says that the new engine produces fewer emissions, boasts improved throttle response, and experiences less internal friction, the latter enhancement contributing to better fuel-economy numbers." The article went on to note that:

> [t]his is an important engine for Volkswagen. Last year, one out of every four VWs sold in the United States was equipped with a TDI Clean Diesel engine, according to the company, and together with VW Group's luxury brand Audi, more than 100,000 TDI Clean Diesel vehicles hit American roads.

Even while revising and updating the 2.0 liter TDI® Clean Diesel engine between the 2009 through 2015 model years, Volkswagen continued to include, in each revision, the illegal defeat device that allowed it to appear compliant with federal and state emissions requirements. And

throughout this period, under normal operation, the 2.0 liter TDI® Clean Diesel engine produced levels of NOx that were as much as 40 times higher than the levels allowed for under applicable emissions standards.

### D. The Disclosure of Volkswagen's Deceptive Act Roils the Car Industry

27. On Friday, September 18, 2015, Consumer Reports, a non-profit consumer advocacy group known for its independence and impartiality, responded to the EPA NOV by announcing that it had "suspended its 'recommended' rating of two VW vehicles: The Jetta diesel and Passat diesel." In light of an expected recall, Consumer Reports stated that "[t]hese recommendations will be suspended until Consumer Reports can re-test these vehicles with a recall repair performed. Once the emissions systems are functioning properly, we will assess whether the repair has adversely affected performance or fuel economy." Consumer Reports' decision to suspend its ratings for these vehicles was driven by the seriousness of the EPA NOV.

28. In addition to suspending its recommendations, Consumer Reports issued a blistering statement by Ellen Bloom, the senior director of federal policy for Consumers Union:

> This is a serious violation of the law. ***Volkswagen was ripping off the consumer and hurting the environment at the same time***. The carmaker was apparently installing software in vehicles that effectively let them generate more pollution than advertised. It's outrageous. We applaud the EPA and California for cracking down on Volkswagen. These actions send a powerful message that if a carmaker uses technology to get around the rules, regulators are going to come down hard on you for breaking the law.

29. The statement issued by Consumer Reports also highlighted the impact of Volkswagen's fraud on the consumers who purchased cars equipped with the 2.0 liter TDI® Clean Diesel, stating that "Volkswagen will likely have to recall the vehicles when they have a fix that satisfies both the EPA and CARB." The Consumer Reports statement went on to note that, while consumers could "continue to drive [the cars] normally" …. substantial complications were likely to arise for consumers:

. . . while it is legal to sell the car, CARB and the California Department of Motor Vehicles may not allow the buyer to register the vehicle, and current owners may not be allowed to renew their registrations, until all the emission recall work has been completed. Some states that follow California emission standards (so-called Partial Zero Emission states) also have rules in place that require all emissions-related recalls to be completed before periodical emission testing. If the recall is not completed, the vehicle cannot pass the inspection, and the state will decline renewal of the vehicle registration.

E.    **Volkswagen Acknowledges that it "Screwed Up" and Has "Broken the Trust" of "Our Customers and the Public"**

30.    On Friday, September 18, 2015, shortly after the EPA and CARB NOVs were made public, Volkswagen issued a press release acknowledging the NOVs and claims that "the company takes this matter very seriously and is cooperating with the investigation."

31.    Acknowledging a likely recall, the September 18, 2015 press release further stated that:

> Volkswagen is committed to fixing this issue as soon as possible. We want to assure customers and owners of these models that their automobiles are safe to drive, and we are working to develop a remedy that meets emissions standards and satisfies our loyal and valued customers. Owners of these vehicles do not need to take any action at this time.

32.    However, as the full extent of Volkswagen's deceit became public, the company was forced to issue an additional statement over the ensuing weekend, acknowledging "manipulations" by the company that resulted in the violation of environmental standards. Thus, on Sunday, September 20, 2015, Volkswagen issued this statement from its CEO, Martin Winterkorn.

> **Wolfsburg, September 20, 2015 - The U.S. Environmental Protection Agency and the California Air Resources Board (EPA and CARB) revealed their findings that while testing diesel cars of the Volkswagen Group they have detected manipulations that violate American environmental standards.[2]**
>
> The Board of Management at Volkswagen AG takes these findings very seriously. ***I personally am deeply sorry that we have broken the trust of our customers and the public***. We will cooperate fully with the responsible agencies, with

---

[2] Emphasis in original.

transparency and urgency, to clearly, openly, and completely establish all of the facts of this case. Volkswagen has ordered an external investigation of this matter.

We do not and will not tolerate violations of any kind of our internal rules or of the law.

The trust of our customers and the public is and continues to be our most important asset. We at Volkswagen will do everything that must be done in order to *re-establish the trust* that so many people have placed in us, and we will do everything necessary in order to *reverse the damage this has caused*. This matter has first priority for me, personally, and for our entire Board of Management.

33.     On September 21, 2015, in Brooklyn, New York, Volkswagen America CEO Michael Horn acknowledged that "we have totally screwed up."[3]

34.     The revelations regarding the extent of Volkswagen's fraud continued on September 22, 2015 with Volkswagen's acknowledgment that 11 million cars sold by Volkswagen included the same defeat device discovery by the EPA and CARB. Volkswagen also announced that it had set aside $7.3 billion to address the fall-out from its fraud.

**F.     Volkswagen's Defeat Device Breached Express Warranties**

35.     In connection with the sale (by purchase or lease) of new vehicles, Volkswagen provided an express New Vehicle Limited Warranty, applicable to each vehicle and covering a period of 3 years or 36,000 miles, whichever occurs first. This New Vehicle Limited Warranty "covers any repair to correct a manufacturing defect in materials or workmanship."

36.     In addition, in its Federal Emissions Control System Defect Warranty, Volkswagen warranted every vehicle it sold for a period of 2 years or 24,000 miles and asserted that each of its vehicles:

•       "was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA)," and

---

[3] http://www.nytimes.com/video/business/international/100000003928968/volkswagen-we-have-totally-screwed-up.html?hp&action=click&pgtype=Homepage&modref=HPVideoRefer&module=first-column-region&region=top-news&WT.nav=top-news.

- "is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations . . . ."

## TOLLING OF THE STATUTE OF LIMITATIONS

37.     Any applicable statute(s) of limitations has been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and the other Class members could not have reasonably discovered the true, latent defective nature of the CAN buses until shortly before this class action litigation was commenced.

38.     Defendant was and remains under a continuing duty to disclose to Plaintiff and the other members of the Class the true character, quality, and nature of the 2.0 liter TDI Clean Diesel Engine, that this defect is a purposeful design by Volkswagen, and that it will require costly repairs, and diminishes residual or the resale value of the affected vehicles. As a result of the active concealment by Defendant, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

39.     The claims of all class members derive directly from a single course of conduct by Volkswagen.  Volkswagen has and continues to engage in uniform and standardized conduct toward the Class. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Members of the Class. The objective facts on these subjects are the same for all members of the Class. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating the certification of multi-state classes for some or all claims. Accordingly, Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3)

and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

40.    Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a Nationwide Consumer Class defined as follows:

> All persons or entities in the United States who purchased or leased vehicles manufactured by Volkswagen that were equipped with the 2.0 liter TDI Clean Diesel Engine subject to the September 18, 2015 Notice of Violation letters issued by the EPA and CARB.

41.    Plaintiff also brings this action and seeks to certify and maintain as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on his own behalf and on behalf of a New Hampshire Consumer Class defined as follows:

> All persons or entities in the state of New Hampshire who purchased or leased vehicles manufactured by Volkswagen that were equipped with the 2.0 liter TDI Clean Diesel Engine subject to the September 18, 2015 Notice of Violation letters issued by the EPA and CARB.

The Nationwide Consumer Class and the New Hampshire Subclass are sometimes referred to herein as the "Class" or "Classes."

42.    Excluded from the Classes are: Volkswagen; any affiliate, parent, or subsidiary of Volkswagen; any entity in which Volkswagen has a controlling interest; any officer, director, or employee of Volkswagen; any successor or assign of Volkswagen; counsel for the Plaintiff or anyone employed by counsel for Plaintiff in this action and his immediate family; any Judge to whom this case is assigned and his or her immediate family and staff.

43.    This action has been brought and may properly be maintained on behalf of the Classes proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

44.    **Numerosity**. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Plaintiff is informed and believes that there are over a million defective Class Vehicles nationwide as alleged above. Individual joinder of all Class members is impracticable.

45.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendant or third parties in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

46.     **Existence and predominance of common questions**. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members as is required by Fed. R. Civ. P. 23(a)(2). These common questions include the following:

a.     Whether Volkswagen engaged in the conduct alleged herein;

b.     Whether Volkswagen designed, manufactured, advertised, marketed, distributed and sold vehicles with the 2.0 liter TDI® Clean Diesel engine in the United States;

c.     Whether the 2.0 liter TDI® Clean Diesel engine is defective in that it is not compliant with federal and state emissions standards and requirements;

d.     Whether the 2.0 liter TDI® Clean Diesel engine was purposefully designed to include a defeat device in order to evade the requirements of federal and state emissions standards and requirements;

e.     Whether and how long Volkswagen was aware of the existence of a defeat device in the 2.0 liter TDI® Clean Diesel engine;

f.     Whether Volkswagen knowingly designed, manufactured, marketed, advertised, distributed and sold vehicles equipped with the 2.0 liter TDI® Clean Diesel and a defeat device;

g.     Whether the 2.0 liter TDI® Clean Diesel engine can be made, through a recall, to comply with federal and state emissions standards and requirements;

h.     Whether any changes necessary to make vehicles equipped with the 2.0 liter TDI® Clean Diesel engine compliant with federal and state emissions standards and requirements will negatively impact the performance, fuel efficiency or function of the affected vehicles;

i.     Whether any changes necessary to make vehicles equipped with the 2.0 liter

TDI® Clean Diesel engine compliant with federal and state emissions standards and requirements will diminish the residual or resale value of the affected vehicles;

j.   Whether purchasers of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine overpaid for those vehicles;

k.   Whether the Defendant engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose the existence of the defeat device.

l.   Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability.

m.   Whether Defendant is liable to the Class for damages and/or penalties, as a result of its own knowledge, conduct, action, or inaction, and if so, in what amount;

n.   Whether Plaintiff and the other Class members are entitled to equitable relief, including but not limited to restitution or a preliminary and/or permanent injunction.

47.   **Typicality**. Plaintiff's claims are typical of the claims of the Class as is required by Fed. R. Civ. P. 23(a)(3), because, among other things, Plaintiff purchased a Class Vehicle which contain the same design defect found in all other Class Vehicles.

48.   **Adequacy**. Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the members of the Classes he seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.   As such, they meet the requirements of Fed. R. Civ. P. 23(a)(4).

49.   **Declaratory and Injunctive Relief**. Federal Rule of Civil Procedure 23(b)(2): Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

50.     **Superiority**. The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Volkswagen economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the design defect, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

51.     In the alternative, the Classes may be certified because:

a.      the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members;

b.      the prosecution of separate actions by individual members of the Class would create varying standards of conduct required of the defendant;

c.      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

d.      Volkswagen has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## CLAIMS FOR RELIEF

### (On behalf of the Nationwide Class)

### COUNT I

### FRAUD BY CONCEALMENT

52.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-50 above as if set forth fully herein.

53.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Consumer Class.

54.     Defendant misrepresented, failed to disclose and or concealed facts from Plaintiff and the members of the Class which were known, or through reasonable care should have been known, by Defendant to be false and material and were intended by Defendant to mislead Plaintiff and the members of the Class.

55.     Defendant had a duty to disclose the existence of the defeat device and the non-compliance with federal and state laws and regulations regarding vehicle emissions because Defendant marketed vehicles equipped with the 2.0 liter TDI® Clean Diesel engine as possessing certain performance and fuel economy characteristics and as being in compliance with all applicable federal and state emissions standards.  Having made representations to the public about the functionality, fuel economy, performance and compliance with applicable laws and regulations of the 2.0 liter TDI® Clean Diesel engine Defendant was under a duty to disclose these omitted facts.

56.     Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew these facts were not known to or reasonably discoverable by Plaintiff and the other Class Members. These concealed and omitted facts were material because they directly

impact the performance, fuel economy, road worthiness and residual and resale value of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine.

57.     Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and members of the Class to purchase or lease Class Vehicles at a higher price than the vehicles were in fact worth.

58.     Plaintiff and other members of the Class were unaware of these omitted material facts that were actively and intentionally concealed and/or suppressed, in whole or in part, by Defendant.

59.     Had Plaintiff and other members of the Class known these material facts, they would not have acted as they did.

60.     As a result of the conduct of Defendant, Plaintiff and members of the Class have been damaged because the residual and resale value of their vehicles equipped with the 2.0 liter TDI® Clean Diesel engine have been diminished as a result of Defendant's fraudulent concealment of its scheme to circumvent federal and state emissions regulations, laws and standards.

61.     In addition, based on information and belief, Plaintiff anticipates that any recall of the vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, if effective in meeting applicable federal and state emissions regulations, laws and standards, will degrade the performance and/or fuel economy of said vehicles, further reducing the residual or resale value of the vehicles.

62.     Accordingly, Defendant is liable to Plaintiff and members of the Class damages in an amount to be proven at trial, including, but not limited to punitive or exemplary damages.

# COUNT II

## INTENTIONAL MISREPRESENTATION

63.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-61 above as if set forth fully herein.

64.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Consumer Class.

65.     Plaintiff purchased his Volkswagen vehicle equipped with the 2.0 liter TDI® Clean Diesel engine based upon representations and advertisements wherein Volkswagen stated that vehicles equipped with the 2.0 liter TDI® Clean Diesel were "clean", fuel efficient, and compliant with federal and state emission laws, regulations, and standards.

66.     As set forth in detail above, Defendant knew that vehicles equipped with the 2.0 liter TDI® Clean Diesel engine VW Clean Diesel Vehicles were not "clean" and were not compliant with federal and state emission laws, regulations and standards.

67.     Plaintiff is informed and believes, and thereon alleges that Defendant undertook a systematic pattern of misrepresenting the true nature of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, including but not limited to the true nature of their emissions. The exact misrepresentations made by Defendant are known exclusively by Defendant and the unidentified Class Members. This Complaint will be amended, if required, to specify each and every misrepresentation made by Defendant in its advertisements, sales materials etc.

68.     By misrepresenting the true nature of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, Defendant misrepresented to Plaintiff, members of the Class, the EPA, CARB and other governmental agencies the actual amount of harmful emissions being placed into the environment by vehicles equipped with the 2.0 liter TDI® Clean Diesel engine. Additionally, Plaintiff and members of the Class Members paid more for their vehicles than they

otherwise would have paid for similar vehicles that did not purport to be "clean" and fuel efficient.

69.    Plaintiff is informed and believes, and thereon alleges, that these types of misrepresentations concerning the environmental impact of vehicles equipped with the 2.0 liter TDI® Clean Diesel were commonly made by Defendant, or caused by Defendant to be made and provided to Plaintiff and other members of the Class.  These common misrepresentations were material in that the amount paid by Plaintiff and other members of the Class Members for vehicles equipped with the 2.0 liter TDI® Clean Diesel engine were inflated as a result of the misrepresentations.  Defendant's representations concerning the true nature of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine were, in fact, false, and intentionally made to mislead Plaintiff and other members of the Class.

70.    The common representations made by Defendant regarding vehicles equipped with the 2.0 liter TDI® Clean Diesel engine were made with the intention to induce Plaintiff and the other members of the Class to rely upon them in order to induce the purchase the vehicles.

71.    Reliance by Plaintiff and the other members of the Class upon Defendant's representations was reasonable and justified under the circumstances alleged herein.

72.    Reliance by Plaintiff and the other members of the Class upon Defendant's representations was reasonable and justified given the fact that Defendant is a highly-regulated automobile manufacturer and distributor, with a legal duty to accurately calculate and report emission levels to the EPA and various state regulators. Plaintiff and other members of the Class Members had a right to rely on Defendant to accurately represent the information concerning vehicles equipped with the 2.0 liter TDI® Clean Diesel engine.

73.    Additionally, Plaintiff's and the other members of the Class' reliance on Defendant's representations was reasonable and justified given the belief by Plaintiff and the

other members of the Class that Defendant would act in good faith in reporting information to the EPA and similar state regulators.

74.     Plaintiff and the other members of the Class had no reason to believe that the representations made to the EPA in Defendant's applications for certificates of conformity for vehicles equipped with the 2.0 liter TDI® Clean Diesel engine were not true.

75.     Plaintiff is informed and believes, and thereon alleges that, in reliance on these representations, Plaintiff and the other members of the Class were induced to and did purchase vehicles equipped with the 2.0 liter TDI® Clean Diesel engine based upon misrepresentations made by, or caused to be made by, Defendant.

76.     As a proximate result of Defendant's wrongful acts and omissions as alleged herein, Plaintiff and the other members of the Class have been damaged in an amount according to proof at time of trial including, but not limited to, damages needed to compensate Plaintiff and the other members of the Class for the loss in fair market value that each of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine will suffer, as well as increased costs that may result due to decreases in vehicle performance once the vehicles equipped with the 2.0 liter TDI® Clean Diesel engine are "fixed" through recall and brought into environmental compliance, assuming such a fix is possible.

**COUNT III**

**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT**

**(15 U.S.C. § 2301, *et seq.*)**

77.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-75 above as if set forth fully herein.

78.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Consumer Class.

79.     Plaintiff and the members of the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

80.     Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

81.     Vehicles equipped with the 2.0 liter TDI® Clean Diesel engine are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1). Title 15, United States Code, section 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

82.     Defendant's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). Implied warranties for vehicles equipped with the 2.0 liter TDI® Clean Diesel engine are covered under 15 U.S.C. § 2301(7). As described in detail above, Defendant breached these warranties.

83.     Vehicles equipped with the 2.0 liter TDI® Clean Diesel engine share a common defect in that they were designed and manufactured with a defeat device that prevents the vehicles from complying with applicable federal and state laws and regulations including, but not limited to, the Clean Air Act, when being driven under normal conditions.

84.     Plaintiff and other members of the Class have had sufficient direct dealings with either Defendant or its agents (dealerships and technical support) to establish privity of contract between Defendant, on one hand, and Plaintiff and each member of the Class on the other hand. In addition, Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of vehicles equipped with the 2.0 liter TDI® Clean Diesel engine and have no rights under the warranty

agreements provided with these vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

85. Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Defendant has engaged in a multi-year scheme to conceal the existence and function of its defeat device, therefore misleading Plaintiff, members of the Class and relevant regulatory authorities.

86. At the time of sale or lease of each Class Vehicle, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning vehicles equipped with the 2.0 liter TDI® Clean Diesel engine and their inability to perform as warranted. Despite this knowledge, Defendant failed to rectify the situation and/or disclose the defect. Thus remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

87. Plaintiff and other members of the Class would suffer economic hardship if they returned their vehicles equipped with the 2.0 liter TDI® Clean Diesel engines but did not receive the return of all payments made by them. Because Defendant is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted these vehicles by retaining them.

88. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

89.     Plaintiff, individually and on behalf of all other members of the Class, seek all damages permitted by law, including diminution in value of the vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, in an amount to be proven at trial.

## COUNT IV

## BREACH OF CONTRACT/COMMON LAW WARRANTY

90.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-88 above as if set forth fully herein.

91.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Class.

92.     Plaintiff, individually and on behalf of the other members of the Class, pleads injury under common law warranty and contract law.  Defendant limited the remedies available to Plaintiff and the other members of the Class to repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Defendant and/or warranted the quality or nature of those services to Plaintiff and the other members of the Class.

93.     Defendant breached this warranty or contract obligation by failing to repair or replace the defective emissions systems on vehicles equipped with 2.0 liter TDI® Clean Diesel engine.

94.     The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendant promised that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff the other members of the Class fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff and the other members of the Class' rights and benefits under the contract.

95.     Plaintiff and the other members of the Class have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract

96.     Defendant breached the contract and the implied covenant of good faith and fair dealing by, *inter alia*, including a defeat device in vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, thus rendering these vehicles out of compliance with federal and state emissions laws, regulations and standards.

97.     As a direct and proximate result of Defendant's breach of contract or common law warranty, Plaintiff and the other members of the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## NEGLIGENT MISREPRESENTATION

98.     Plaintiff incorporates by reference all allegations set forth in paragraphs 1-97 above as if set forth fully herein.

99.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Consumer Class.

100.    Defendant had a duty to provide honest and accurate information to its customers so that customers could make informed decisions regarding the purchase or lease of automobiles.

101.    Defendant specifically and expressly misrepresented material facts to Plaintiff and the other members of the Class, as set forth in detail above, including, but not limited to representations that vehicles equipped with the 2.0 liter TDI® Clean Diesel engine complied with federal and state emissions laws, regulations and standards and possessed certain performance and fuel economy characteristics.

102.    Defendant knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer would be misled by these misrepresentations.

103.    Plaintiff and the other members of the Class justifiably relied on Defendant's misrepresentations and have been damaged thereby.

**(Claims on behalf of the New Hampshire Subclass)**

## COUNT VI

### VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### (N.H. REV. STAT. ANN. § 358-A:1, et seq.)

104.    Plaintiff incorporates by reference all allegations set forth in paragraphs 1-103 above as if set forth fully herein.

105.    Plaintiff brings this claim on behalf of himself and on behalf of the members of the New Hampshire Consumer Subclass.

106.    Plaintiff, the New Hampshire Subclass, and Volkswagen are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

107.    Volkswagen's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

108.    The New Hampshire Consumer Protection Act prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. § 358-A:2.

109.    Volkswagen participated in unfair or deceptive acts or practices that violated the New Hampshire Consumer Protection Act as described above and below. By fraudulently installing the "defeat device" to make it appear that its clean diesel engine systems complied with EPA regulations, Volkswagen engaged in deceptive business practices prohibited by the New Hampshire Consumer Protection Act, including representing that such vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that such

vehicles are of a particular standard, quality, and grade when they are not; advertising such vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving such vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, o deceptive acts or practices in the conduct of trade or commerce.

110.    In the course of its business, Volkswagen installed the "defeat device" and concealed that its clean diesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of such vehicles.

111.    Volkswagen has known of its use of the "defeat device" and the true nature of its diesel engine system for at least six years, but concealed all of that information until recently.

112.    Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

113.    By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the clean diesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in unfair and deceptive business practices in violation of the New Hampshire Consumer Protection Act.

114.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the clean diesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that such vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

115.    Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true cleanliness and efficiency of the vehicle's clean diesel engine system, the quality of the Volkswagen and Audi brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of such vehicles.

116.    Volkswagen intentionally and knowingly misrepresented material facts regarding such vehicles with intent to mislead Plaintiff and the New Hampshire Subclass.

117.    Volkswagen knew or should have known that its conduct violated the New Hampshire Consumer Protection Act.

118.    As alleged throughout this complaint, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of such vehicles and the Volkswagen and Audi brands that were either false or misleading.

119.    Volkswagen owed Plaintiff and the New Hampshire Subclass a duty to disclose the true safety, cleanliness, efficiency and reliability of the clean diesel vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen: (1) Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations; (2) Intentionally concealed the

foregoing from Plaintiff; and/or (3) Made incomplete representations about the safety, cleanliness, efficiency and reliability of the clean diesel vehicles generally, and the use of the "defeat device" and true nature of the clean diesel engine system in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

120.    Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the clean diesel engine system, resulting in an onslaught of negative publicity once the use of the "defeat device" and true characteristics of such vehicles' engine system finally began to be disclosed, the value of these vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

121.    Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the clean diesel engine system were material to Plaintiff and the New Hampshire Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

122.    Plaintiff and the New Hampshire Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information.

123.    Volkswagen had an ongoing duty to all Volkswagen and Audi customers to refrain from unfair and deceptive acts or practices under the New Hampshire Consumer Protection Act. All owners of such vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

124. Volkswagen's violations present a continuing risk to Plaintiff as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

125. As a direct and proximate result of Volkswagen's violations of the New Hampshire Consumer Protection Act, Plaintiff and the New Hampshire Subclass have suffered injury-in-fact and/or actual damage.

126. Because Volkswagen's willful conduct caused injury to New Hampshire Subclass members' property through violations of the New Hampshire Consumer Protection Act, the New Hampshire Subclass seeks recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining Volkswagen's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;

2. For an order appointing Plaintiff as representative of the Nationwide Class and New Hampshire Subclass, and his counsel of record as Class counsel;

3. For an award of actual, general, special, incidental, statutory, compensatory and consequential damages on all claims in an amount to be proven at trial;

4. For an award of exemplary and punitive damages in an amount to be proven at trial;

5. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

6. For an order enjoining the wrongful conduct alleged herein;

7. For costs;

8. For interest;

9. For attorneys' fees under applicable law; and

10. For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

127. Plaintiff hereby demands a jury trial for all claims so triable.

DATED: September 25, 2015

Respectfully submitted,

BRANSTETTER, STRANCH
& JENNINGS, PLLC

J. GERARD STRANCH, IV (BPR #23045)
JOE P. LENISKI, JR.(BPR #22891)
The Freedom Center
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37201
Telephone: (615) 254-8801
Facsimile: (615) 250-3937

*Attorneys for Plaintiff*